(No. 64402

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MATTHEW JAMES, Appellee.

*Opinion filed October 5, 1987.*

CUNNINGHAM, J., took no part.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Paul P. Biebel, Jr., Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellee.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Matthew James, and a codefendant, Edward Meeks, were charged by indictment in the circuit court of Cook County with the offenses of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1), robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—1) and home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a)(1)). Prior to trial, both defendants moved to suppress statements

made following their arrests. Meeks' motion was granted, and charges against him were subsequently dropped. James' motion was denied, and he proceeded to trial. He was found guilty by a jury of all charges. The trial judge did not impose a sentence for rape, finding that offense was subsumed in the murder conviction.

The appellate court, with one justice dissenting, reversed the decision of the trial court and remanded for a new trial on the ground that James' confession was the fruit of his illegal arrest and therefore should have been suppressed. (149 Ill. App. 3d 214.) We granted the State's petition for leave to appeal. 107 Ill. 2d R. 315.

On the morning of June 26, 1982, the body of Josephine Hayes was discovered by Juan Ortiz, the maintenance man at her apartment building. When the police arrived at the scene, they observed that entry to the apartment had apparently been gained via a broken kitchen window. The body was sprawled across a sofa with hands and legs tied. Ms. Hayes had been strangled to death. She was wearing a white blouse but was nude from the waist down, and her face was covered with rags. A purse and its scattered contents were on the bed, and various papers were strewn about the apartment.

Ortiz told the police that Josephine Hayes had moved into the apartment the previous week. She had been assisted by three men in a red Ford truck. One of the men was known to Mr. Ortiz, but only by the nickname "Gigolo." Ortiz testified that Gigolo was at Ms. Hayes' apartment on Monday, June 21, and again on Wednesday, June 23. Ortiz last saw the victim on Friday evening, June 25. On that occasion, the victim indicated that she was expecting to receive about $50,000 in the very near future.

The police eventually determined that the man known as "Gigolo" was Eddie Meeks. Meeks was located and

brought in for questioning. He at first denied involvement, but was kept in custody overnight awaiting a polygraph examination. The next afternoon he was questioned again, and was also asked to turn over the gym shoes he was wearing in order to compare them to a shoeprint which had been found at the scene. At that point, Meeks gave a confession which also implicated the defendant, Matthew James.

Meeks stated that James was one of the men who had helped Josephine Hayes move into her apartment. On the evening of June 25, James proposed robbing Ms. Hayes because they believed she had a large sum of money in the apartment. According to Meeks, the two men went to the rear of the building and jumped the fence. Next to the back door was a window which had previously been cracked and taped. James tapped on the window until another crack developed, enabling him to remove the glass. The men then entered the apartment.

Meeks was going through a purse in the front room when he heard screams. He went into the bedroom and saw James with his hand on the victim's throat. She was nude from the waist down. The men then tied her hands and feet and left the apartment.

Based upon these statements by Meeks, the police located the defendant and brought him into custody. The defendant initially denied any knowledge of the crimes but, after being informed that Meeks had implicated him, admitted involvement and ultimately signed a written confession.

Both Meeks and the defendant moved to suppress their statements as fruits of illegal arrests. The trial court ruled that Meeks' arrest was without probable cause and suppressed his confession. With regard to James' motion, however, the court stated, "I believe the police clearly did have probable cause prior to making the arrest, notwithstanding the fact that I suppressed

the fruits of the Meeks arrest ***." James was convicted following a trial during which his confession was admitted into evidence.

The appellate court reversed the defendant's conviction on the ground that his confession was the product of his unlawful arrest. The court determined that the sole basis for James' arrest was Meeks' statement and that Meeks' uncorroborated statements were insufficient to establish probable cause to arrest James.

In this court the defendant puts forth two related, but distinct, claims. He first contends, as the appellate court held, that his arrest was unlawful as without probable cause, and that his statements should be suppressed as the fruit of that illegal arrest. Alternatively, he asserts that even if his own arrest was lawful, his statements were nonetheless the fruits of Meeks' unlawful arrest, and should be suppressed on that ground. We will consider each of these arguments in turn.

In declaring that James' arrest was without probable cause, the appellate court relied upon *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, to support its holding that Meeks' uncorroborated incriminating statements were insufficient to provide probable cause. Thus, we begin our analysis with a discussion of *Wong Sun*.

The facts of *Wong Sun* defy succinct summation. Stated as briefly as possible, Federal narcotics agents arrested a man named Hom Way and found heroin in his possession. Hom Way told the agents that he had purchased the heroin from someone named "Blackie" Toy, who operated a laundry on Leavenworth Street. Based solely upon this information, the agents went to "Oye's Laundry" on Leavenworth. The laundry was in fact operated by James Wah Toy, but nothing in the record identified him to the police as the "Blackie" Toy to whom Hom Way had referred.

Toy denied having sold heroin, and a search of his residence failed to turn up any narcotics. However, Toy directed the agents to another person, Johnny Yee, who, Toy claimed, was a heroin dealer, and with whom Toy admitted having used heroin the previous evening. The agents went to Yee's residence and questioned him. He turned over a quantity of heroin and told the agents that he had received the heroin from Toy and yet another individual, Wong Sun.

Toy and Wong Sun were eventually convicted of concealment of illegally imported heroin. At their trial, the court admitted into evidence the incriminating statements made by Toy following his arrest.

The Supreme Court reversed Toy's conviction on the ground that his post-arrest statements should have been suppressed as the fruit of his unlawful arrest. In explaining its conclusion that the agents lacked probable cause to arrest Toy, the Court stated:

> "The narcotics agents had no basis in experience for confidence in the reliability of Hom Way's information; he had never before given information. And yet they acted upon his imprecise suggestion that a person described only as 'Blackie Toy,' the proprietor of a laundry somewhere on Leavenworth Street, had sold one ounce of heroin. We have held that identification of the suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect. [Citation.] That rule does not, however, fit this case. For aught that the record discloses, Hom Way's accusation merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one 'Blackie Toy's' laundry—and whether by chance or other means (the record does not say) they came upon petitioner Toy's laundry, which bore not his name over the door, but the unrevealing label 'Oye's.' Not the slightest intimation appears on the record, or was made on oral argument, to suggest that the agents had information giving them reason to

equate 'Blackie' Toy and James Wah Toy—e.g., that they had the criminal record of a Toy, or that they had consulted some other kind of official record or list, or had some information of some kind which had narrowed the scope of their search to this particular Toy." *Wong Sun v. United States* (1963), 371 U.S. 471, 480-81, 9 L. Ed. 2d 441, 451, 83 S. Ct. 407, 413-14.

The appellate court appears to have interpreted *Wong Sun* as establishing a firm principle that uncorroborated statements by an arrestee can *never* constitute probable cause for the arrest of a co-offender. In our view, this is not an accurate statement of the law. (See, *e.g.*, *People v. Atkinson* (1974), 21 Ill. App. 3d 258.) We hold that, under the circumstances, Meeks' statements were sufficient to establish probable cause to arrest James, and we thus reverse the decision of the appellate court. We hold this view for a variety of reasons.

First, the appellate court's extrapolation of such a broad rule from *Wong Sun* ignores the fact-bound nature of the holding in that case itself, as evidenced by the language quoted above. Hom Way's statements were deemed inadequate *in part* because Hom Way was not shown to be reliable, but *also* because the information he provided regarding Toy was vague and nonspecific. Here, setting aside the assertion that Meeks was not shown to be reliable, the information he provided about the offense had been corroborated by the officer's observations at the scene. Moreover, his statements implicating James were specific and unequivocal.

We do not agree with the assertion that there is "no basis" upon which to conclude that Meeks' statements were reliable. The information relied upon to establish probable cause to arrest must be supported by some indicia of reliability. The Supreme Court, in *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, discussed a two-prong test with which the probable

cause information must comply: (1) credibility or reliability and (2) basis of knowledge. In *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584, the Supreme Court reaffirmed the two-prong test of *Aguilar* and discussed methods by which these tests may be satisfied. The Court suggested that the credibility or reliability prong could be supported by detailing reasons in support of the conclusions that the informant is reliable and by independent corroboration of the information given by the informant. In *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, the Supreme Court abandoned the rigid two-prong test that had developed under *Aguilar* and *Spinelli* and suggested instead the totality-of-the-circumstances approach in the determination of probable cause, noting that this approach permits a balanced assessment of the relative weights of all the various indicia of reliability attendant upon the giving of the probable cause information.

One indicia of reliability of information is found in admissions against the penal interests of the party giving the information. Courts and commentators have observed that admissions against penal interest may, by their very nature, possess inherent indicia of reliability. (*United States v. Harris* (1971), 403 U.S. 573, 29 L. Ed. 2d 723, 91 S. Ct. 2075; 1 W. LaFave, Search & Seizure sec. 3.3(c) (2d ed. 1987).) This theory is best explained by an illustration:

In the typical "informant" scenario, an individual about whom little, if anything, is known, provides information to the police which implicates another person. In many cases, even the informant's identity is undisclosed. In such a situation an independent showing of reliability is required because of the obvious risk of misrepresentation or outright fabrication. See generally *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.

Likewise, if a criminal suspect is offered leniency or promised anonymity if he provides information against others, that information is clearly suspect because of the obvious motivation to shift blame to someone else. (1 W. LaFave, Search & Seizure sec. 3.3(c) (2d ed. 1987); see also *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) In this setting as well, some independent basis of reliability may be necessary to establish probable cause.

This case presents an entirely different situation. First, Meeks admitted his own involvement in the crimes, something which common sense indicates one does not do lightly or falsely. Thus, the overall reliability of his statements is enhanced. Second, the record does not reveal that Meeks was offered any specific inducement or "deal" for identifying his accomplices. He no doubt realized that he would remain in custody whether he talked or not. In such a circumstance, he had nothing to gain by providing false information for, once the falsehood was discovered, he would have to suffer the consequences of misleading the police. As one court put it, a person "who knows the police are in a position to charge him with a serious crime will not lightly undertake to direct the police down blind alleys." (*United States v. Davis* (D.C. Cir. 1979), 617 F.2d 677.) By charging that defendant James was involved in the crime, Meeks was not absolving himself of criminal responsibility. He was still held on a murder charge and his statement furnished evidence in support of that charge. It is true that the testimony of an accomplice has been said to be suspect because of the motivation to shift the blame to others. (See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) However, we are here in a probable cause setting and not at the trial stage. It has been noted that the danger of fabrication is less in this setting. In a situation such as exists in this case,

"courts have been most willing to find there has been a sufficient showing of veracity." See 1 W. LaFave, Search & Seizure sec. 3.3(c) (2d ed. 1987).

The reliability of Meeks' accusation of James is further supported by the independent verification of a substantial part of his statement by the facts learned through police investigation. True, there was no independent verification that James was involved in the criminal conduct. However, when part of Meeks' story has been verified, the corroboration lends credence to the remaining unverified portion. See 1 W. LaFave, Search & Seizure sec. 3.3(f) (2d ed. 1987).

To summarize the facts before us: The police arrested Meeks for his suspected involvement in the Hayes homicide. He provided a confession of his participation, the details of which had been corroborated by the officer's observations at the crime scene. He also furnished a contemporaneous, specific identification of his accomplice, the defendant, James. Under these circumstances, we hold that this information was sufficient to provide probable cause for James' arrest. To decide otherwise would ignore the Supreme Court's admonition that the probable cause determination is a "commonsense, practical question." *Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328.

The trial court found that the police had probable cause to arrest James. Judging that holding by the totality-of-the-circumstances test of *Gates*, we cannot say that the trial court erred.

The defendant's second contention is that, notwithstanding the legality of his own arrest, his confession should have been suppressed as the tainted fruit of the unlawful arrest of Meeks. He argues that since he confessed only after being confronted with the statements illegally obtained from Meeks, his confession was an exploitation of that underlying illegality and is hence inad-

missible. This assertion also fails, for the fundamental reason that the defendant lacks standing to contest the legality of Meeks' arrest.

It is a fundamental principle that a claim to suppress the product of a fourth amendment violation can be asserted "only by those whose rights were violated by the search or seizure itself." Since the defendant's own rights were not violated, he may not vicariously seek suppression of evidence as a remedy for such a violation of another's fourth amendment rights.

Contrary to the defendant's argument, *Wong Sun* does not support his position. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) As discussed earlier in this opinion, Blackie Toy and Wong Sun were tried together and narcotics seized from Johnny Yee were offered as evidence against both defendants. The narcotics were held inadmissible against Toy because they were the product of statements made by Toy at the time of his unlawful arrest. However, the same evidence was admitted against Wong Sun because he had never been the subject of any illegal search or arrest. "The seizure of this heroin invaded no right of privacy of person or premises which would entitled Wong Sun to object to its use at his trial." 371 U.S. 471, 492, 9 L. Ed. 2d 441, 458, 83 S. Ct. 407, 419.

This reasoning controls in this case as well. Here, the victim of the illegal arrest, Meeks, has standing to seek suppression of the fruit of that arrest. He has, in fact, successfully done so. James, on the other hand, may be aggrieved by the admission of the product of *someone's* illegal arrest, but his *personal* privacy rights have not been violated. Thus, like Wong Sun, he is not entitled to object to the use of the evidence against him, and his statement was therefore properly admitted.

In the appellate court the defendant also argued that the extended term sentence of 50 years for his convic-

tion of murder was excessive. The appellate court, because of its reversal of defendant's conviction, did not address this question. As an alternative argument in this court, the defendant again urges that the extended term sentence of 50 years for his murder conviction is excessive. The defendant points out that his only prior conviction has been a misdemeanor conviction for possession of a hypodermic needle. The defendant also argues that he was not the instigator of this crime and that he merely obeyed the orders of Meeks, the other participant. The record does not support defendant's minimal participation contention or his assertion that he only obeyed Meeks' orders. He readily agreed to go with Meeks to the victim's house for the purpose of stealing a substantial sum of money which they thought she had. When they found the victim asleep on a couch, Meeks held a pillow over her face and the defendant removed her pants and stockings. The defendant then held the pillow on her face while Meeks raped her and then Meeks held the pillow while the defendant raped the victim. Both men then asked the victim where the money was located while Meeks was choking her. When she did not tell them Meeks choked her until she lost consciousness. Both men then searched the house for money, took $11 from her purse and left by the front door.

Following the sentencing hearing, the State sought a sentence of natural life, while the defendant's attorney asked that the sentence be the minimum for murder, 20 years. The court, before imposing sentence, stated that the victim was murdered brutally and, "while she was in the process of having her life snuffed out," the defendant and Meeks both "subjected her to the additional degradation of rape." The court then noted the brutality and heinousness of defendant's conduct, stating "not your associate's, but your conduct."

This court, under Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), has the power to reduce a sentence imposed by the trial court. However, this court has held that the matter of imposing sentence is a matter of judicial discretion and the standard to be applied in determining whether a sentence is excessive is: Did the trial judge abuse his discretion? (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492.) In *La Pointe*, this court also emphasized that the trial court is normally the proper forum in which a suitable sentence is to be determined and that the trial judge's decisions in regard to sentencing are entitled to great deference and weight. (88 Ill. 2d 482, 492-93.) It is not the function of this court to serve as a sentencing court, and we will not substitute our judgment for that of the trial court "merely because we would have balanced the appropriate factors differently if the task of sentencing would have been ours." *People v. Cox* (1980), 82 Ill. 2d 268, 280.

As noted above, the trial court viewed this crime as a brutal and heinous offense and stated his reasons for this belief. We do not consider that the trial judge abused his discretion in imposing the extended term sentence, and we do not think that we should substitute our judgment for his. At the sentencing hearing the judge specifically noted:

> "[T]he facts of the case as found by the jury, your appearance in the courtroom, your conduct on the witness stand, other things that I have observed during the course of the trial, including the pre-sentence investigation that has been presented to me by the Department of Probation, these are the things that determine what my sentence will be."

The trial judge gave serious consideration to all of these sentencing factors and arrived at his conclusion. We do not think this determination should be set aside simply because we may have, if we were the sentencing judge

and had an opportunity to assess these same sentencing factors, arrived at a different determination.

For the reasons stated, we reverse the judgment of the appellate court and affirm the judgment of the circuit court of Cook County.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.